1840.

Bishop
*v.*
Breckles.

---

## BISHOP *v.* BRECKLES.

EVEN where a period is prescribed for the duration of a partnership, it seems doubtful whether either partner may not dissolve it upon due notice. At any rate very little can be required to justify this court in interfering. Violent disputes and dissensions which entirely prevent the beneficial effects of a connection, are sufficient.

Where such dissensions existed, and one partner refused to proceed, and declared that in consequence of what had been done by his co-partner the works should be stopped, a dissolution was decreed.

Sept. 18. 29.

THE bill was filed to procure a decree dissolving the partnership between the complainant and the defendant, and for the usual accounts to be taken. It contained various allegations of improper conduct on the part of the defendant, and of his refusal to go on with the business. The defendant denied these statements, and opposed the dissolution.

*Mr. Holden,* for the complainant.

*Mr. Sears,* for the defendant.

THE ASSISTANT VICE-CHANCELLOR :—The fact that the articles of co-partnership were never signed is not

material, because the bill states that they were drawn, and that the copy annexed contains all the terms agreed upon between the parties. The answer admits them, and the defendant avers that the business was conducted according to them. The allegation that the business was to be conducted according to the general law of partnership until signature is explicitly denied. The advertisement also, inserted by the direction of the parties, contains the term of the duration of the partnership. Under these circumstances, the articles must form the basis of the account, if any is decreed.

The duration of the firm as agreed upon was to be seven years. And then the question is what are the rules of the court as to decreeing a dissolution of a firm where, a period being prescribed, it cannot be terminated at the mere will of either party.

Mr. Collyer, (p. 161,) states the doctrine thus : " It may " with safety be laid down that not only wilful acts of " fraud and bad faith, but gross instances of carelessness " and waste in the administration of the partnership, as well " as exclusion of the other partners from their just share of " the management, so as to prevent the business from being " conducted on the stipulated terms, are sufficient grounds " for a dissolution by a court of equity." He cites the leading cases *Goodman* v. *Whitcomb*, (1 *Jac. & Walk*, 592, &c.) He cites also a case (*De Berenger* v. *Hammil*, 7 *Jarm. Conv.* p. 26,) as deciding that although this relief will not be administered for mere defects of temper in some of the parties, yet violent and lasting dissension seems to be a ground on which the court will decree a dissolution ; as where the parties refuse to meet each other on matters of business—a state of things which precludes the possibility of the partnership affairs being conducted with advantage.

In *Skinner* v. *Dayton*, (17 *Johns. Rep.* 538,) Justice Platt says : " Even where partners covenant with each " other that the partnership shall continue seven years, " either party may dissolve it the next day, by proclaiming " his determination for that purpose ; the only consequence

"being, that he thereby subjects himself to a claim for "damages for breach of his covenant."

Chancellor Kent (3 *Com.* 58,) observes, "that the com- "mentators on the institutes lay down the principle as "drawn from the civil law, that each partner has the "power to dissolve the connection at any time, notwith- "standing any convention to the contrary. They hold "every such convention null, and that it is for the public "interest that no partner shall be bound to continue in a "partnership against his will, inasmuch as the community "of goods in such a case engenders discord and litiga- "tion."

But in *Bearpoint* v. *Graham,* (4 *Wash. C. C. Rep.* 234,) J. Washington says : "It is perfectly clear that one "partner cannot, by withdrawing himself from the associa- "tion before the period stipulated for its continuance, either "dissolve the partnership, or extricate himself from the "responsibilities of a partner."

A case of *Chanany* v. *Van Sumoner* is mentioned by Mr. Woodeson, (*Lectures,* 3d vol. 416 *n.* See also, 1 *Swanston,* 512 *n.*,) of an injunction being granted restrain- ing a defendant from dissolving a partnership. The case was in 1771.

The law of the court, then, requires something more than the mere will of one party to justify a dissolution. But it seems to me that but little should be demanded. The principle of the civil law is the most wise. Why should this court compel the continuance of an union, when dis- sension has marred all prospect of the advantages con- templated at its formation ? By refusing to dissolve it, the power of binding each other, and of dealing with the partnership property remains, when all confidence and all combination of effort is at an end. The object of the con- tract is defeated.

Upon these principles, the evidence fully justifies the court in granting the relief sought. Miller says, that last summer a year ago, (being the summer of 1838,) he called upon Breckles at Bishop's request, and urged him to come to a settlement of their business upon friendly terms. If

a different course was pursued he would lose all he had. The drift of Breckles' conversation was, that he did not care any thing about it, and let the consequence be what it might he meant to persist in his course. That course, as the witness understood it, was to stay upon the place, sit still and do nothing.

The advertisement of the dissolution inserted by Bishop had been made before this conversation. It was dated the 7th of August. Breckles was offended at it, and Miller afterwards offered on Bishop's part, to insert any other which should be thought satisfactory. Another interview took place between them about three weeks afterwards. Miller offered to put in any advertisement which should satisfy the defendant. He urged that the business might go on, that they might work up their unwrought stuff, and pay the debts. Breckles refused, saying that Bishop had stopped the work, and it should stand so. That he would not employ hands, and if Bishop did so, he would discharge them. He was told that the course pursued would inevitably ruin both of them if persisted in. Watts, a witness of the defendant, says, that in July, 1838, Bishop went to the East for his health, and said he would not be back till the 1st of August ensuing. He thinks he was gone about three weeks, and came back the day before the one he had appointed. Then (fol. 43,) he says that previous to Bishop's going to the East he heard a conversation between the parties as to a settlement of their differences by arbitration. Bishop offered to buy him out, or to sell out to him. After Bishop's return, Watts heard another conversation in which Bishop declared his resolution not to go on as they had done—that they should have a new agreement, to last until the Spring ; in substance pressing for a dissolution at that time. Williams deposes to a positive declaration of Bishop, that the concern should not go on upon the old agreement. This was in August, 1838.

Owen says that, as near as he can recollect, in August, 1838, Breckles declared that there was no use of Bishop's dragging on the business, for he would not go on, nor

could Bishop make him go on. Add to this the averments in the answer of Bishop's being indolent, neglectful, and deceitful—and on what ground can this court refuse a decree destroying a connection which can only be fruitful of discord and evil ?

There must be a decree dissolving the partnership, and a reference to a master to state the account upon the footing of the articles.

Perhaps some special directions may be necessary, which the parties will attend to in settling the decree.

Neither party to have costs down to this time as against the other.